## SARAH M. PIPER *versus* CHARLES D. GILMORE.

Certain notes payable to A. were by him deposited with B., in pledge as security for his indebtedness to B.  C., being desirous of collecting a claim of his own against A., made inquiries of B. as to the notes; and B., without being informed of the purpose of the inquiry, replied that the notes belonged to A.:—*Held*, that, without proof that B. intended to deceive C. to his injury, these facts do not operate as an *estoppel in pais*, to prevent B. claiming money paid to him on the notes, notwithstanding the money was attached and seized by C. at the time of payment.

In such a case, in order that B. should be estopped from setting up a title to the money, it must be shown that he wilfully gave false information to C., with an intention to deceive him, and to induce him, on the faith of it, to act in a different manner than he otherwise would have done, whereby C. was led so to change his action, and was thereby injured.

TRESPASS against the defendant as sheriff of Penobscot county, to recover damages for his taking $290 in specie, alleged to be the property of the plaintiff. Plea the gen-

eral issue, with a brief statement justifying the taking of the money as the property of Mark W. Piper, by virtue of a writ of attachment in favor of Henry Pendexter, against Mark W. Piper and Martin V. B. Piper. The action, *Pendexter* v. *Piper*, was entered and prosecuted to judgment, and the $290 applied to satisfy the execution.

In July, 1854, Pendexter, having bought a farm of Mark W. Piper and Martin V. B. Piper, gave them his notes for $800, and a mortgage of the farm as security. The notes not having been paid, the mortgagees gave notice of their intention to foreclose it. May 19th, 1856, Martin assigned his interest in the notes and mortgage to the plaintiff.

There was evidence tending to show that Mark was, at the time of Martin's assignment, indebted to the plaintiff, $425 and interest; that Martin delivered Mark's share of the notes and mortgage to the plaintiff, Mark being then in New York; that, on his return to Kenduskeag in 1857, he obtained further advances of the plaintiff, and agreed with her that she might hold the notes and mortgage as security.

In 1858, R. S. Prescott, agent of Pendexter, and of the owner of the equity of redemption in the farm, asked the plaintiff if Mark owned half of the notes. She replied that he did; that she "had no control so as to allow for the oats, on Mark's part, but no doubt Mark would do what was right."

Soon afterwards, Prescott caused the writ in *Pendexter* v. *Piper & al.* to be made and delivered to an officer, and when Pendexter paid his mortgage notes, the officer attempted to seize the specie, and succeeded, after a struggle, in securing $290, the plaintiff retaining the balance.

There was evidence that Mark W. Piper at the time owned real estate in Kenduskeag, which the officer did not attach.

CUTTING, J., presiding, instructed the jury, that if the plaintiff told the agent of Pendexter that Mark owned half of the notes and mortgage, and he was deceived by such declarations, whatever the knowledge or intention of the

plaintiff may have been, and he attached the specie on the strength of such declaration, and was thereby injured, the plaintiff could not be allowed to claim title to the money attached. And if Mark had other property which could have been attached by Pendexter, and he was deceived by the plaintiff's declarations, and did not attach such property, the jury might consider whether this was an injury to Pendexter.

It did not appear that Mark or Martin was insolvent at the time, nor that the plaintiff knew that Pendexter was about to attach the money, or made any claim to the notes or money, or was about to commence or had commenced a suit.

The jury returned a verdict for the defendant. The presiding Judge inquired of them, to whom they found the money belonged, and they replied that they did not consider that question.

The plaintiff filed exceptions to the instructions of the Court.

*McCrillis & Mace*, for the plaintiff.

*Rowe & Bartlett*, for the defendant, argued that if the attachment was induced by the plaintiff's representations, she could not maintain an action for damages arising from it. *Rangely* v. *Spring*, 21 Maine, 130; *Hatch* v. *Kimball*, 16 Maine, 146; 1 Story's Equity, §§ 385, 387, 390.

Declarations made by one party, and acted upon by the other, and his action thereby changed to his injury, operate in the way of *estoppel* upon the party making them. *Dewey* v. *Field*, 4 Met., 381; *Stone* v. *Dunkin*, 2 Camp., 344; *Harding* v. *Carter*, cited 'by Parke on Ins., 4; *Chapman* v. *Searles*, 3 Pick., 38; *Hearne* v. *Rogers*, 8 Barn. & Cress., 577; *Lewiston Falls Bank* v. *Leonard*, 43 Maine, 344.

The opinion of the Court was drawn up by

MAY, J. — In determining the correctness of the instructions complained of, we may, with propriety, assume that the notes upon which the money attached by the defendant's

deputy, was paid to the plaintiff, were, as against Mark W. Piper, rightfully held by her as security for his liabilities. She seems to have held his share as a pledge for that purpose. The testimony shows that, while she so held them, Prescott, the agent of the attaching creditor, and of the owner of the equity of redemption in the premises mortgaged to secure said notes, called upon her and inquired "if Mark W. Piper owned half the notes;" and she replied that "she had bought Martin's part, and that Mark's part of the mortgaged notes was his. She had no control, so as to allow for the oats, on Mark's part. No doubt he would do what was right."

She does not appear to have been apprized of the agency of Prescott, nor of any desire on his part to make an attachment to secure the demand of Henry Pendexter, his principal, which was afterwards put in suit. The notes were not attachable, and there is no evidence that she then knew that payment of the notes would soon be made, if made at all. At this time, Mark W. Piper was the general owner of his half therein, and, if not paid, the loss would fall upon him. There had been no written assignment of his part to the plaintiff. Her title to them was but an equitable title, but the money due upon them when paid, according to the arrangement of the parties, would become hers. The receipt of it would so far operate as a payment of her debt against Mark. She did not say that the money, when paid, would not be hers. Strictly speaking, therefore, there was no falsehood in the statement that "Mark's part of the mortgaged notes was his."

Under these circumstances, the jury was instructed "that if the plaintiff told the agent of Pendexter that Mark owned one half of the notes and mortgage, as testified to, and he was deceived by such declarations, whatever the knowledge or intention of the plaintiff, and attached the specie on the strength of such declarations, and has been thereby injured, the plaintiff could not now be allowed to claim title to the money attached. This instruction makes the know-

ledge and intentions of the plaintiff touching his statements wholly immaterial. By it, he is estopped from showing the honesty of his purposes, the truth of his statements, or his ignorance of the purposes, wishes or rights of the attaching creditor. Is such an instruction in conformity with the law?

Estoppels *in pais* are created by the law for the purpose of doing justice. They are called equitable estoppels, in contradistinction to an estoppel by a deed or record. Whether they exist in specific cases is often a question of great difficulty. The rules of law in regard to them seem to be well established. They may arise from a variety of facts, and often depend in a great degree upon the relations which exist between the parties. The general rule of law in regard to them, in England and this country, is, that "a party will be concluded from denying his own acts or admissions, which *were expressly designed* to influence the conduct of another, and did so influence it, and when such denial will operate to the injury of another." *Cummings, adm'r,* v. *Webster,* 43 Maine, 192; *Rangeley* v. *Spring,* 21 Maine, 130; *Wallis* v. *Truesdell,* 6 Pick., 455; *Welland Canal Co.* v. *Hathaway,* 8 Wend., 430. The rule, as laid down in *Pickard* v. *Sears & al.,* 6 Ad. & Ellis, 469, is, that "where one, by his words or conduct, *wilfully* causes another to believe in the existence of a certain state of things, and induces him to act on that belief, or to alter his own previous position, the former is concluded from averring against the latter a different state of things, as existing at the same time." In all the cases where an estoppel has been held to exist, it is believed that it will appear, upon examination, that there was some evidence tending to show that the party estopped had some knowledge of the rights, interests, or intentions of the other party, or of his relations to the thing to which his declarations or acts related; or, that he had some intention of misleading the other party into some action that might be prejudicial to him. In every case there will be found some degree of bad faith, either expressly designed or construc-

tive. The authorities wherever the question has been raised, most, if not all of them, agree that the declarations or conduct. must have been wilful in order, to have the estoppel attach.

What is meant by the term wilful is well determined, not only in England but in our own State. In the case of *Freeman* v. *Cooke*, 6 Dowl. & L., 187, and 2 Exch., 654, it was decided that. unless the statement was *intended* to induce the other party to act on the faith of it, or was such that a reasonable person would act upon the faith of it, *believing that it was intended by the party making it that he should·so act,* no estoppel would be created, notwithstanding the other party did in fact believe the statement, and was induced to alter his position accordingly. See Harrison's Dig., vol. 7, p. 614, Phila. ed., and cases there cited. The rule upon this point is, that *whatever a·man's real meaning may have been, he must so conduct himself that a reasonable man would take the representation to be true, and believe that it was meant that he should act upon it,* or the party making the representation will not be precluded from contesting its truth. Such is also the settled law of Connecticut. *Taylor & al.* v. *Ely & al.*, 25 Conn., 250; *Preston* v. *Mann & al., ibid.*, 118.

In commenting upon the general rule in regard to estoppels *in pais,* as laid down in *Pickard* v. *Sears & al.*, before cited, WHITMAN, C. J., in the case of *Copeland* v. *Copeland*, 28 Maine, 525, remarks, that "in the position thus established, it must be observed that several things are essential to be made out in order to the operation of the rule; the .first is, that the *act or declaration of the person must be wilful,* that is, with knowledge of the facts upon.which any right he may have must depend, or with an intention to deceive the other party; he must, at least, it would seem, *be aware.that he is giving countenance to the alteration of the conduct of the other, whereby he will be injured if the representation be untrue.*"

In the case of *Morton, adm'r,* v. *Hodgdon*, 32 Maine, 127, it is said by WELLS, J., in the opinion concurred in by

the Court, that, "before one can be conclusively bound by a declaration made in relation to his interest in property, such declaration must be *designed* to influence the conduct of the person to whom it is addressed, and must have that effect." The facts in this case will be found to be not very dissimilar from the present case. The declaration there relied on was held not to have been wilful, because it appeared that the party making it *did not know that the other party had any demand against Clark, nor that he needed or had any occasion for information on the subject.* The same learned Judge, in *Sullivan* v. *Parks*, 33 Maine, 438, says, in delivering the opinion of the Court, that "the declarations of a party, which should estop him, as to a third person, *must be made to one who has a right to know the relations of the party to the property in question; if made only to a person having no such right, they would not necessarily create an estoppel.*"

In the case before us, the limitation or qualification of the general rule, relating to estoppels *in pais*, as shown by the preceding authorities, seems to have been overlooked; and the instructions given, being in direct conflict with such limitation or qualification, are manifestly erroneous. It becomes unnecessary to consider the other instructions.

*Exceptions sustained.*

TENNEY, C. J., RICE, APPLETON, CUTTING and KENT, JJ., concurred.