Preston *et al. v.* Witherspoon *et al.*

No. 12,843.

PRESTON ET AL. *v.* WITHERSPOON ET AL.

| 109 | 457 |
| 125 | 331 |
| 109 | 457 |
| 140 | 174 |
| 109 | 457 |
| 144 | 62 |

BAILMENT.— *Warehouseman.—Sale.—Commingling of Grain.—Estoppel.—Innocent Purchaser.*—Where one deposits wheat for storage, knowing that it is to be commingled with wheat purchased by the owner of the warehouse, and that the latter is selling and publicly shipping from the common mass, he thus confers an apparent ownership and authority to sell, and is estopped to assert title as against an innocent purchaser in the usual course of business.

From the Gibson Circuit Court.

*M. W. Fields* and *L. C. Embree,* for appellants.

*J. E. McCullough, J. H. Miller* and *J. W. Ewing,* for appellees.

ZOLLARS, J.—The nature of the case sufficiently appears from the special finding of facts made by the court below at the request of appellants.

As the brief of counsel for appellees contains a fuller statement of the facts found than does the brief of counsel for appellants, we take therefrom the following summary, making a few additions thereto :

The defendants, Runcie & Wallace, under the firm name of "The Fort Branch Elevator Company," were engaged at Fort Branch in buying, selling and shipping wheat, and for hire receiving wheat from farmers for storage, and on demand of the depositors were to return to them wheat of a like kind, quality and amount as that deposited, but not the identical wheat.

The company occupied an elevator and warehouse, situated fifty or sixty feet apart. The elevator contained fourteen bins, each holding, when filled, three thousand bushels of wheat, and the warehouse three bins, holding six thousand bushels.

The plaintiffs severally, during the months of June, July and August, 1883, deposited wheat, in amounts set out in the finding. The wheat deposited by the plaintiffs was all de-

livered at and taken in at the elevator, except two hundred bushels of the plaintiff Preston's wheat, which was taken in and stored at the warehouse.

The company from July 10th, 1883, to March 1st, 1884, received for storage from the plaintiffs and other depositors forty thousand bushels of wheat, and during the same time bought, sold and shipped on their own account fifty-five thousand bushels.

The wheat bought and the wheat deposited was nearly all taken in at the elevator, being hauled there in wagons by the farmers, and unloaded into a common receptacle, and from there elevated to the bins in the elevator, and in this way all the wheat purchased and taken in at the elevator, and all the wheat deposited and stored in the elevator, was mixed and mingled together.

It was the custom of the company to sell wheat from the elevator, and to ship from the elevator in car lots of from one to five cars at a time, the shipments being publicly made from the elevator from day to day and from week to week. The plaintiffs knew that the company was selling wheat, and knew at the time they deposited their wheat, that the custom of the company was to mix wheat purchased and stored, and sell from the common bin.

About the 1st of March, 1884, the company sold and shipped from the warehouse four cars of wheat (two cars of Mediterranean, and two of Fultz,) to the defendants, Witherspoon, Barr & Emison, who were engaged in the milling business at Princeton, Indiana, under the firm name of Witherspoon, Barr & Co.

The Mediterranean wheat was purchased by Runcie & Wallace and stored by them in the warehouse, separate and apart from any wheat of their customers, and also separate and apart from other wheat bought and sold by the elevator company.

The firm of Witherspoon, Barr & Co. purchased and paid the Fort Branch Elevator Company the contract price and

market value of said wheat, in the due course of business, and without having any knowledge or information that plaintiffs, or any one else, had or claimed to have any interest in or title to the same.

"The Fort Branch Elevator Company," on their own account, from July 10th, 1883, to March 7th, 1884, sold and shipped the fifty-five thousand bushels of wheat bought, and also the forty thousand bushels deposited by the plaintiffs and others, except the four cars sold to Witherspoon, Barr & Co., and the two thousand three hundred and seventy-seven bushels left in the elevator after the company ceased to do business, which was March 7th, 1884. The wheat thus left in the elevator was taken by the depositors and divided *pro rata* among themselves.

A short time before the sale to Witherspoon, Barr & Co., Preston, being in the warehouse with Wallace, said to him: "Where is my wheat?" and Wallace said: "There is all of your wheat," pointing to a pile of wheat in the warehouse, containing three or four thousand bushels. And a few days afterward the plaintiff Preston, and Wallace, went together to Vincennes to sell the wheat, and being unable to realize a satisfactory price, they started back to Fort Branch; and on their way back it was understood that Wallace should stop off at Princeton, and see what was the best offer he could get for the wheat. Wallace stopped off, went to Witherspoon, Barr & Co. and sold the wheat shipped to them a few days afterward.

After it was all paid for and all unloaded except one-third of one car, the plaintiffs made a demand on Witherspoon, Barr & Co., for the wheat, who refused to give it up.

The court found, as a conclusion of law, that the defendants, Witherspoon, Barr & Emison, were not liable to the plaintiffs, or either of them, in any sum whatever, because,

1. The Mediterranean wheat, bought by said Runcie & Wallace, is not of the kind or quality of that deposited by the plaintiffs or either of them.

2. The facts do not show that the Fultz wheat, so bought by Witherspoon, Barr & Emison, was the wheat of the plaintiffs or either of them.

3. Because (in any view of the facts) Runcie & Wallace were, by the voluntary acts of the plaintiffs, clothed with the apparent title and right to sell, and the said Witherspoon, Barr & Emison were *bona fide* purchasers for value.

The only error assigned by the appellants is, that upon the facts specially found, the trial court erred in its conclusions of law.

Upon the facts found by the trial court, are Witherspoon, Barr & Co. liable to the plaintiffs who deposited wheat with the Fort Branch Elevator Company? That is the question, and the only question for decision here.

In the case of *Rice* v. *Nixon*, 97 Ind. 97 (49 Am. R. 430), cited by counsel for appellants, the question was, whether, as between the depositors and the warehouseman, the latter should be held as a bailee or as a purchaser of the wheat deposited for storage, which, without his fault and before a demand therefor by the depositors, had been destroyed by fire. The depositors sought to hold him liable as a purchaser, because he had mixed their wheat in a bin with wheat deposited by others, and with wheat purchased by him, and had sold from the common mass. That he had done, in keeping with a custom of his. But of that custom the depositors, prosecuting the action, had no knowledge. There was always in the bin wheat enough to supply all depositors, and at any time before the fire they could have received from the bin all the wheat they had deposited. Upon the facts thus before the court, it was held that the warehouseman was a bailee, and not a purchaser, of the wheat so deposited.

It will be observed, that in that case the wheat deposited had all been deposited in, and the sales made from, a common bin, and that it does not appear whether or not any of the wheat deposited by the plaintiffs in the action remained in

the bin at the time of the fire. See, also, *Bottenberg* v. *Nixon*, 97 Ind. 106.

The case of *Schindler* v. *Westover*, 99 Ind. 395, also cited by appellants' counsel, involved a question of title to wheat, as between the depositors and a mortgagee of the warehouseman. The wheat (five hundred bushels) had been stored to be kept until the 1st of the following July. The depositors requested that their wheat should be kept in a separate bin. That the warehouseman declined, but agreed that the wheat should not be taken from the mill, and that he would return a like amount and a like quality whenever called for by the depositors. The wheat was stored in a bin with the wheat of other depositors, and with wheat bought by the warehouseman, and from the common mass, wheat was taken in the manufacture of flour. Before the 3d day of the following March, all of the wheat so received from the depositors, together with that with which it had been so commingled, had been ground into flour and disposed of by the warehouseman. On that day there were 1,900 bushels of wheat in the mill, and the warehouseman executed a chattel mortgage thereon. The mortgagees, under and by virtue of that mortgage, took possession of and sold the wheat. Before it was removed from the mill the depositors demanded of the warehouseman and the mortgagees, the amount of wheat by them deposited. It was held that the depositors and depositary were tenants in common of the 1,900 bushels of wheat then in the mill; that the title of the depositors to 500 bushels of wheat in the mill was superior to any claim of the depositary, although the identical wheat stored by them had been previously manufactured into flour; that the mortgagees could not, and did not, by virtue of the chattel mortgage, acquire a better title to the wheat mortgaged than the mortgagor had; that upon demand by the depositors for a return of the 500 bushels (so much being then in store), their title thereto was absolute and perfect as against the depositary, or those claiming under him, and that if such demand were refused, they could main-

tain replevin for the possession of the wheat, or if, after de-
mand for the return of the wheat, the parties in possession
should convert the same to their own use, the depositors could
maintain an action for the recovery of damages for such
wrongful conversion of the wheat.

It will be observed, that in that case the wheat mortgaged
was in the mill at the time the mortgage was executed, and
at the time the demand was made by the depositors, and that
in quantity it was more than equal to the amount stored by
the plaintiffs in the action.

· In the case before us, the wheat sold by the elevator com-
pany to Witherspoon, Barr & Co., was not kept in the same
bin, nor in the same building where appellants' wheat was
kept, while it was kept by the elevator company. In this
regard, the facts in the case differ from the cases above cited.
The warehouse, however, seems to have been used by the ele-
vator company in the transaction of its general business, and
was situated but fifty or sixty feet from the elevator.

Whether this difference in the facts of the cases requires a
different ruling as to the rights of the depositors and the de-
positary, as between themselves, is a question we need not
here decide. For the purposes of this decision, we may
assume that the elevator company held appellants' wheat as
bailee.

The agreement was that the elevator company should re-
turn to the depositors, not the identical wheat deposited, but
wheat of a like kind and quality. Two car loads of the wheat
sold to Witherspoon, Barr & Co. was Mediterranean wheat, pur-
chased by the elevator company, and stored in the warehouse,
whence it was shipped to the purchasers.

As we understand counsel for appellants, they do not claim
that there can be a recovery for that wheat, as it was not of
the kind and quality of the wheat stored by appellants. The
other two car loads, so sold to Witherspoon, Barr & Co., were
Fultz wheat, the same as that stored by appellants.

The case before us differs in other important regards from

the cases above cited. There, the wheat in question was in the bins where it had been placed upon being stored; in one case, at the time when the fire occurred, and in the other, at the time the mortgage was executed and the demand therefor was made. Here, the wheat in question was not in the possession of the depositary, nor was it in the building where it had been stored, at the time the demand therefor was made upon Witherspoon, Barr & Co. On the contrary, Witherspoon, Barr & Co. had purchased it in the usual course of business, and had paid for it, without any knowledge of any claim by appellants; it had been shipped to them, and was in their possession as such innocent purchasers. When appellants stored their wheat, they knew that the custom of the elevator company was to mix all the wheat stored and that purchased by the company in a common bin or bins, and to sell and ship from the common mass. They knew, also, after their wheat had been stored, that the elevator company was selling and shipping wheat from the common mass. It was the custom of that company, as found by the court, to ship from the elevator from one to five cars at a time, the shipments being publicly made from day to day, and from week to week.

We think, as concluded by the court below, that by the voluntary acts of appellants, Runcie & Wallace, the persons composing the elevator company, were clothed with the apparent title and right to sell, and that as Witherspoon, Barr & Co. were innocent purchasers in the usual course of business, they should be protected.

As a general proposition, it is well settled both in law and reason, that no one can convey a better title to property than he has. In other words, no one without title to property can convey title thereto, and thus defeat the claims of the rightful owner. But there are many cases where the owner of property will be estopped to assert his title thereto as against an innocent purchaser for value. We think this is such a case. As we have seen, appellants knew that their wheat was to be

and was commingled with wheat purchased by the elevator company, and that that company was selling and publicly shipping from the common mass. They, therefore, knew that others were purchasing the wheat from the elevator company, in the usual course of business, and paying their money therefor. By thus putting their wheat into the possession of the elevator company, and allowing it to sell and ship from the common mass, they clothed that company with an apparent ownership of and authority to sell the wheat, which estops them to assert their title thereto, as against Witherspoon, Barr & Co., who invested their money in good faith, believing that to be a fact which appellants by their conduct permitted to appear to be a fact. *Quick* v. *Milligan,* 108 Ind. 419, and cases there cited.

As between appellants and the elevator company, the question is, what authority did the elevator company in fact have to sell and dispose of their wheat? As between appellants and Witherspoon, Barr & Co., the question is, with what apparent authority did appellants clothe the elevator company to sell and dispose of their wheat?

In the case of *Cowdrey* v. *Vandenburgh,* 101 U. S. 572, it was said: "The principle is well settled that when the owner of property in any form clothes another with the apparent title or power of disposition, and third parties are thereby induced to deal with him, they shall be protected. * * * * The rights of innocent third parties * * * 'do not depend upon the actual title or authority of the party with whom they deal directly, but are derived from the act of the real owner, which precludes him from disputing, as against them, the existence of the title or power which, through negligence or mistaken confidence, he caused or allowed to appear to be vested in the party making the conveyance.'"

Either appellants or Witherspoon, Barr & Co. must suffer by the alleged wrong of the elevator company. As between them, the loss ought to fall upon appellants.

Not asking that their identical wheat should be kept for

them, they trusted to the honesty of the elevator company, that in quantity and quality the amount stored should be returned to them.  As between them and the elevator company, they are innocent, of wrong or laches.  As between them and Witherspoon, Barr & Co., the rule should be applied, that where one of two innocent persons must suffer by the wrong of a third person, he must be the sufferer who put it in the power of the wrong-doer to cause the loss.

In the case of *New York, etc., R. R. Co.* v. *Schuyler,* 34 N. Y. 30 (69), we find this statement: " It goes back to the celebrated aphorism of Lord HOLT, in *Hern* v. *Nichols* (1 Salk. 289), ' For seeing somebody must be a loser by this deceit, it is more reason that he that employs and puts a trust and confidence in the deceiver, should be a loser than a stranger,' or as more tersely expressed by ASHHURST, J., in *Lickbarrow* v. *Mason* (2 T. R. 70), ' Whenever one of two innocent parties must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it.' "  See, also, *Quick* v. *Milligan, supra ; Hunter* v. *Fitzmaurice,* 102 Ind. 449; *Young* v. *Bradley,* 68 Ill. 553.

Our attention is called to sections 6526, 6537 and 6541, R. S. 1881.  Sections 6526 and 6537 are in the act, as originally passed, providing for licensed warehouses.

As the houses owned and operated by the elevator company are not shown to have been such licensed warehouses, the provisions of that act have no application or relevancy here, if in any event anything therein could in any way affect the rights of innocent purchasers in a case like this.

Section 6541, and the sections following, were in another act, as originally passed, defining who are warehousemen, fixing their rights, liabilities, etc.  There is nothing in the act that can affect or destroy the rights of Witherspoon, Barr & Co., being innocent purchasers, under the circumstances of this case.

It is well known that the vast crops of this State are moved

largely through the agency of elevators. Through them our surplus productions in grain reach the markets, whether in neighboring States, on the seaboard, or abroad. To hold that dealers can not acquire title to grain stored, as appellants' wheat was stored with the elevator company, without the production to them of the receipts issued to depositors, would be to throw a serious and unreasonable obstacle in the way of the sale and transportation of our crops. The statute was not intended to have that effect, nor to affect the rights of innocent purchasers, in a case like this, as were Witherspoon, Barr & Co.

It is argued further, that the conversation between Preston and Wallace in the warehouse, in relation to the wheat then on hand, operated as an appropriation of that wheat. Whatever might have been said of the effect of that conversation under different circumstances, it is sufficient here, that appellants, including Preston, having clothed the elevator company with the apparent ownership of, and the authority to sell the wheat, can not change the rights of innocent third parties by such private negotiations between themselves and the elevator company. As bearing upon that proposition, see the case of *Pittsburgh, etc., R. W. Co.* v. *Adams*, 105 Ind. 151.

Judgment affirmed, with costs.

Filed Dec. 21, 1886; petition for a rehearing overruled Feb. 26, 1887.